UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BCJJ, LLC,

      Plaintiff,

v.                      CASE NO. 8:09-CV-551-T-17EAJ

THOMAS J. LEFEVRE,
individually and as
Trustee of THOMAS J.
LEFEVRE LIVING TRUST,
et al.,

      Defendants.

_____/

ORDER

This cause is before the Court on:

Dkt. 186 Motion for Summary Judgment - Bayonne, LLC
Dkt. 195 Response and Cross-Motion for
         Summary Judgment
Dkt. 199 Deposition - W. Turkish
Dkt. 200 Deposition - J. Turkish
Dkt. 201 Deposition - L. Nadolski
Dkt. 202 Deposition - E. Berlin
Dkt. 205 Response

The Second Amended Complaint (Dkt. 148) includes the
following claims as to Defendant Bayonne, LLC, f/k/a Bayonne
Development, LLC:

| Count I | 15 U.S.C. Sec. 1703(a)(2) Interstate Land Sales Full Disclosure Act |
| Count II | Sec. 10b and SEC Rule 10-b(5) |
| Count III | Ch. 517.301, Florida Statutes |
| Count IV | Fraudulent Inducement |
| Count V | Negligent Misrepresentation |
| Count XI | Ch. 501.201, Florida Statutes |
| Count XII | Equitable Lien |

Case No. 8:09-CV-551-T-17EAJ

Defendant Bayonne, LLC moves for summary judgment on each count asserted against Defendant Bayonne, LLC.

Plaintiff BCJJ, LLC opposes Defendant Bayonne, LLC's Motion, and has filed a Cross-Motion for Summary Judgment as to each count asserted against Defendant Bayonne, LLC.

Plaintiff BCJJ, LLC seeks entry of summary judgment on the basis that Defendant Bayonne, LLC was a direct participant in the transaction insofar as Defendant Thomas J. LeFevre, a managing member of Defendant Bayonne, LLC warranted that he "would cause Bayonne to use its 'best efforts' to provide Bayonne (sic) with an upgrade from Unit 241 to Unit 441 as part of the deal." Plaintiff BCJJ, LLC argues that the transaction was grounded on an explicit obligation from Defendant Bayonne, LLC, that in the circumstance that the condominium project was materially changed, was not completed by June 15, 2009, or cancelled due to a sale of the Waterfront Property, Plaintiff would receive a full refund of its deposit paid toward a unit in Grande Bay.

Plaintiff BCJJ, LLC argues that Defendant Thomas LeFevre had actual authority to act on behalf of Defendant Bayonne, LLC, as a manager of Defendant Bayonne, LLC. Plaintiff argues that the manager of a limited liability company is an agent of the LLC for purposes of its business. See Ch. 608.4235(2)(b), Florida Statutes (2009).

Plaintiff BCJJ, LLC further argues that Defendant Thomas LeFevre had apparent authority to act on behalf of Defendant Bayonne, LLC. Plaintiff BCJJ, LLC argues that Defendant Bayonne,

2

Case No. 8:09-CV-551-T-17EAJ

LLC held Defendant Thomas LeFevre out as its managing member and
in various other ways as the individual with chief responsibility
at Defendant Bayonne, LLC for development of the Waterfront
Property.  Plaintiff BCJJ, LLC argues that Defendant Thomas
LeFevre was the President of Bayonne, LLC, and the signatory to
the owner's affidavit for permit application purposes.  Plaintiff
BCJJ, LLC argues that the engineering firm retained by Defendant
Bayonne, LLC to conduct subsurface soil exploration on the
Waterfront Property referred to the site as the "LeFevre
Project."

     Plaintiff BCJJ, LLC argues that there is no record evidence
that Defendant Thomas LeFevre lacked authority to act on behalf
of Defendant Bayonne, LLC in connection with Plaintiff BCJJ's
investment, and there is record evidence which establishes the
opposite.  Plaintiff BCJJ, LLC argues that Defendant Thomas
LeFevre routinely acted on behalf of Defendant Bayonne, LLC in
development matters, such as signing the owner's affidavit as
part of a permit application, dealing with the architect for the
proposed development as Defendant Bayonne, LLC's "president" and
retaining the engineering firm which performed the subsurface
soil exploration.  Plaintiff BCJJ, LLC further argues that
Defendant Thomas LeFevre, not Leonard Nadolski, negotiated the
initial purchase contract with Plaintiff BCJJ, LLC for Unit 241
of the condominium.

     Plaintiff BCJJ, LLC argues that the Operating Agreement does
not give notice that Defendant Thomas LeFevre had no authority to
bind Defendant Bayonne, LLC.  Plaintiff argues that the Operating
Agreement establishes Defendant Thomas LeFevre as one of
Defendant Bayonne, LLC's two managers, along with Leonard

3

Case No. 8:09-CV-551-T-17EAJ

Nadolski.  Plaintiff argues that the Operating Agreement provides
that "All decisions shall be made by a majority of the then
serving Managers" and provides a mechanism for resolving
deadlocks.  Plaintiff BCJJ, LLC argues that there is no
provision in the Operating Agreement which states that
notwithstanding his status as Bayonne's managing member,
Defendant Thomas LeFevre is not an agent of Defendant Bayonne,
LLC with authority to bind the entity.  Plaintiff argues that
such a provision would be necessary to defeat the statutory
presumption that Defendant LeFevre was an agent of Defendant
Bayonne, LLC, pursuant to Ch. 608.4235, Florida Statutes.

     Plaintiff BCJJ, LLC argues that Evan Berlin's deposition
testimony that Defendant Berlin told Plaintiff BCJJ, LLC that
Defendant Bayonne was not a party to the transaction is
contradicted by the express terms of the Unit Upgrade Agreement,
which places Defendant Bayonne, LLC in direct privity with
Plaintiff BCJJ, LLC.  Plaintiff further argues that Defendant
Thomas LeFevre's status as a managing member, and the lack of any
provision in the Operating Agreement of Defendant Bayonne, LLC
which restricted Defendant Thomas LeFevre's ability to act on
behalf of Defendant Bayonne, LLC, establish Defendant Thomas
LeFevre's status as an agent of Defendant Bayonne, LLC.

     Plaintiff BCJJ, LLC argues that there is no record evidence
of a disagreement between Leonard Nadolski and Defendant Thomas
LeFevre as to Plaintiff BCJJ's investment.  Jason Turkish
testified that Plaintiff BCJJ, LLC was given no reason to believe
that Leonard Nadolski objected to the investment transaction with
Plaintiff BCJJ, LLC.

4

Case No. 8:09-CV-551-T-17EAJ

Plaintiff BCJJ, LLC argues that it is undisputed that
Defendant Evan Berlin was Defendant Bayonne, LLC's counsel.
Plaintiff argues that Defendant Berlin's testimony that he did
not represent Defendant Bayonne, LLC in connection with Plaintiff
BCJJ, LLC's investment transaction is self-serving and should not
be credited.

Plaintiff argues that Defendant Berlin prepared the Joint
Development Agreement, prepared the documents implementing
Plaintiff BCJJ, LLC's transaction, prepared Defendant Bayonne,
LLC's corporate documents and the documents for planned
condominium on the Waterfront Property.  Plaintiff BCJJ, LLC
argues that Defendant Bayonne, LLC paid Defendant Berlin's bills,
although Defendant Berlin performed work for both Bayonne, LLC
and Bayonne Investments, LLC, and Defendant Bayonne Investments,
LLC did not pay Defendant Berlin.  Plaintiff argues that the
evidence establishes that Defendant Berlin represented Defendant
Bayonne, LLC at the time of Plaintiff BCJJ's investment, and in
connection with that investment.

Plaintiff BCJJ, LLC argues that Defendant Berlin and his
firm prepared and provided the documents which falsely represent
Defendant Thomas LeFevre's ability to pledge his interest in TT
and GLRS as security.  Plaintiff argues that Defendant Bayonne,
LLC is liable to Plaintiff through the acts of Defendant Berlin
as Defendant Bayonne, LLC's agent.

Plaintiff BCJJ, LLC argues that there was a "joint venture"
or "joint enterprise" relationship between Defendant Bayonne, LLC
and Defendant Bayonne Investments, LLC.  Plaintiff contends that
the Joint Development Agreement and other evidence establish the

5

Case No. 8:09-CV-551-T-17EAJ

presence of a joint venture relationship.  Based on the presence
of the joint venture relationship, Plaintiff argues that
Defendant Bayonne, LLC is vicariously liable for the acts of
Defendant Bayonne Investments, LLC.

I.  Standard of Review

     Summary judgment should be rendered if the pleadings, the
discovery and disclosure materials on file, and any affidavits,
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law.
Fed.R.Civ.P. 56(c).

> "The plain language of Rule 56(c) mandates
> the entry of summary judgment after adequate
> time for discovery and upon motion, against a
> party who fails to make a showing sufficient
> to establish the existence of an element
> essential to that party's case, and on which
> that party will bear the burden of proof at
> trial."

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

     The appropriate substantive law will guide the determination
of which facts are material and which facts are...irrelevant.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All
reasonable doubts about the facts and all justifiable inferences
are resolved in favor of the non-movant.  See Fitzpatrick v. City
of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is
genuine "if the evidence is such that a reasonable jury could
return a verdict for the non-moving party."  See Anderson, 477
U.S. at 248.  But, "[i]f the evidence is merely colorable...or is
not significantly probative...summary judgment may be granted."

6

Case No. 8:09-CV-551-T-17EAJ

Id. at 249-50.

II.  Judicial Notice

The Court takes judicial notice of the public records of the
State of Florida Division of Corporations, which establish that
the name of Bayonne Development, LLC was changed to Bayonne, LLC
on December 15, 2006.

The Court also takes judicial notice of the public records
of the State of Florida Division of Corporations, which establish
that Bayonne Investments, LLC was formed on September 27, 2005.

III.  Statement of Facts

1.  The documents which comprise the transaction of March
27, 2007 from which the claims in this arose are attached to the
Second Amended Complaint (Dkt. 148), and include: 1) Exhibit B -
Purchase Agreement for Membership Interest (Thomas J. LeFevre as
Trustee of Thomas J. LeFevre Living Trust Dated October 8, 2001
("Seller") and Tom's Friends, LLC ("Company")to BCJJ, LLC
("Purchaser") (Dkt. 148-2); 2) Exhibit C - Tom's Friends, LLC,
Unanimous Consent of Members (Dkt. 148-3); 3) Exhibit D -
Assignment of Membership Interests (Tom's Friends, LLC (Assignor)
to BCJJ, LLC (Assignee)) (Dkt. 148-4); Exhibit E - Agreement
between Thomas J. LeFevre as Trustee of Thomas J. LeFevre Living
Trust Dated October 8, 2001 ("Seller") to BCJJ, LLC
("Buyer")("Unit Upgrade Agreement")(Dkt. 148-5); Exhibit F -
Security Agreement between Thomas J. Lefevre, Individually and as
Trustee of Thomas J. LeFevre Living Trust Dated October 8, 2001

7

Case No. 8:09-CV-551-T-17EAJ

("Borrower") and BCJJ, LLC ("Lender")(Dkt. 148-6);Exhibit G -
Collateral Assignment of Distributions and Profits between Thomas
J. LeFevre, Individually and as Trustee of Thomas J. LeFevre
Living Trust Dated October 8, 2001 ("Borrower") and BCJJ, LLC
("Lender")(Dkt. 148-7); Exhibit H - Closing Agreement between
Thomas J. LeFevre as Trustee of Thomas J. LeFevre Living Trust
Dated October 8, 2001 ("Seller") and BCJJ, LLC ("Buyer")(Dkt.
148-8).

    2.   Plaintiff BCJJ, LLC is a limited liability company which
was formed for the purpose of purchasing Unit 241 in the
Residences of Grande Bay in 2006. (Exhibit A - Contract for
Purchase and Sale (Dkt. 148-1)).   William Turkish and Francine
Turkish were Plaintiff's managing members at that time.  William
Turkish resides in Florida part of the time and in Michigan part
of the time, commuting back and forth.  William Turkish has been
a solo practitioner practicing Social Security law in Clearwater,
Florida since 1982.  William Turkish has been acquainted with
Defendant Thomas LeFevre since the late 1990's, having met
Defendant LeFevre while traveling between Florida and Michigan.
In his deposition, William Turkish testified that, at some point
after entering into the contract to purchase Unit 241, William
Turkish lent Defendant Thomas LeFevre $70,000 on an unrelated
project (Dkt. 199-1, pp. 5-9, 14, 16-17).

    3.   Jason Turkish is the son of William Turkish and Francine
Turkish.  At the time of the subject transaction in March, 2007,
Jason Turkish had a bachelor's degree in political science from
the University of Michigan and was a candidate for a degree in
urban planning from the University of Michigan.  (Dkt. 200-1, p.

8

Case No. 8:09-CV-551-T-17EAJ

5).  In his deposition, Jason Turkish testified that, within an
urban planning class, he had looked at materials for projects
that had balance sheets in them.  (Dkt. 200-1, p. 27).  Jason
Turkish further testified that his legal training at the relevant
time included two legal internships for judges in Michigan, and
general office and clerical tasks in the law office of William
Turkish.  (Dkt. 200-1, p. 6).

    4.  In his deposition, Jason Turkish testified that, on
March 27, 2007, he acted as a manager of Plaintiff BCJJ, LLC,
pursuant to the request of William Turkish.  (Dkt. 200-1, p.,
169).

    5.  Defendant Thomas LeFevre purchased real property from
Elling O. Eide on February 9, 2005. (Dkt. 186-2, p. 8.)  The
purchase included Tract A-1 and Tract C, the "Waterfront
Property" and the "Commercial Property" referred to in the Second
Amended Complaint (Dkt. 148).

    6.  Defendant Bayonne, LLC was formed for the purpose of
developing the property then known as the "Bayonne Development
Project."  (Article 1.3, Dkt. 186-1, p. 61).  The legal
description of the real property is attached to the Operating
Agreement (Exh. B, Dkt. 186-1, p. 41).

    7.  Defendant Bayonne, LLC was formed on May 11, 2005.
Defendant was then known as "Bayonne Development, LLC." (Dkt.
186-1, pp. 8-39.)  The membership of Defendant Bayonne, LLC
included Thomas LeFevre, Leonard P. Nadolski, and others. (Exh.
A, Dkt. 186-1, p. 85).  Defendant Thomas LeFevre and Leonard P.

Case No. 8:09-CV-551-T-17EAJ

Nadolski were managing members of Defendant Bayonne, LLC.
Defendant LeFevre held 24.54 "Units" of Defendant Bayonne, LLC,
and Leonard P. Nadolski held 30.10 "Units" of Defendant Bayonne,
LLC.

    8.  Article 6.4 of the Operating Agreement provides:

> 6.4 <u>Number</u>.  There shall initially be two
> Managers.  The Managers shall be **Thomas
> LeFevre** and **Leonard P. Nadolski**, who may each
> assign their management responsibilities
> hereunder to any entity of which either holds
> a controlling interest.  The number of
> Managers may be increased only by the
> affirmative vote of the Members holding 70%
> or more of the outstanding Units.  If at any
> time there is one Manager, then any reference
> in this Agreement to the "Managers" shall
> nevertheless refer to the single Manager.
> All decisions shall be made by a majority of
> the then serving Managers.  If more than one
> Manager is then serving, any difference
> arising as to any matter within the authority
> of the Managers shall be decided by a
> majority in number of the Managers.   A
> deadlock shall be deemed to exist if, with
> respect to any issue concerning the Company's
> affairs or management, the votes for and
> against the issue are evenly divided (a
> "Deadlock").  If a Deadlock occurs and is not
> resolved, then for as long as Leonard P.
> Nadolski or any entity of which he holds an
> interest (collectively "Nadolski") hold any
> Units, the decision/determination of Nadolski
> shall resolve the Deadlock.  Notwithstanding
> anything contained herein to the contrary,
> the resolution of a Deadlock as provided
> herein does not relate to, or otherwise
> impair each Member's right to vote on any
> matter as provided elsewhere in this
> Agreement.

Case No. 8:09-CV-551-T-17EAJ

9.   Defendant Thomas LeFevre's units in Bayonne, LLC were
subject to Defendant LeFevre's obligations in the "Vacant Land
Purchase Agreement" which is attached to the Operating Agreement.
(Article 7.9, Dkt. 186-1, p. 29, Dkt. 186-1, pp. 43-49).   The
Vacant Land Purchase Agreement between Defendant Bayonne, LLC and
Defendant Thomas LeFevre required Defendant LeFevre to purchase
the "Commercial Property" for $16,004,744.00.

10.   The Operating Agreement includes an integration clause
(Article 14.2), an interpretation clause (Article 14.7), and an
applicable law clause (Article 14.11) (Dkt. 186-1, p. 37).

11.   On July 11, 2005, Defendant Bayonne, LLC exercised its
option to require Defendant Thomas LeFevre to purchase the
Commercial Property under Article 7.9 of the Operating Agreement.
(Dkt. 186-2, p. 26).   The Option Letter specifies:

> "Per that Agreement, the purchase price shall
> be $16,004,744.00 plus a pro-rated share of
> closing costs and soft costs to be detailed
> in a future correspondence.  The closing
> shall take place on or before September 12,
> 2005.
>
> An access and utility easement of a specific
> nature and design to support the future
> condominium development in the adjacent 13
> acre parcel shall be included with this
> transaction.  Specific details of this
> easement are to be developed with you in the
> near future.  The total costs to develop this
> access are to be shared between Bayonne
> Development, LLC and the new US-41 parcel
> development entity."

12.   Defendant Thomas LeFevre formed Defendant Bayonne

11

Case No. 8:09-CV-551-T-17EAJ

Investments, LLC to purchase the Commercial Property from
Defendant Bayonne, LLC.  Defendant Thomas LeFevre was the sole
managing member of Defendant Bayonne Investments, LLC. (Dkt. 148,
p. 3, par. 11).

    13.  On October 25, 2005, the First Amendment to the
Operating Agreement of Defendant Bayonne, LLC was executed (Dkt.
186-1, pp. 87-98).  Paragraph 2(a) authorized two classes of
"Units," "Managerial Units," and "Investment Units."  In
Paragraph 2(b), the First Amendment authorized a modification to
Article 6.1.  Article 6.1 of the First Amendment defines the
Authority and Power of the Managers.  Article 6.1 provides:

> 6.1 <u>Authority and Power</u>.  Except as expressly
> set forth in this Agreement, and subject to
> Section 6.2 below, only Members who hold
> Managerial Units shall be the Managers, and
> each Member holding Managerial Unit(s) from
> time to time shall have full, exclusive and
> complete authority and discretion to manage
> and control the business of the Company and
> shall make all decisions affecting the
> business of the Company.  Any person dealing
> with the Company may conclusively rely on a
> certificate signed by the Managers as to its
> identity and authority to act on behalf of
> the Company and without further inquiry may
> rely upon the authority of the Managers to
> perform any act or execute and deliver any
> instrument for the Company.  Except as
> expressly set forth in this Agreement, the
> Managers shall have all the rights and powers
> which may be possessed by the Managers
> pursuant to the Act, or which are otherwise
> necessary to operate the Company, including,
> without limitation, the power to:
>
> ....

Case No. 8:09-CV-551-T-17EAJ

> (d) enter into agreements and contracts and
> to give releases, receipts and discharges;...

14.   Paragraph 2(c) of the First Amendment authorized a
modification to Article 6.4, which provides:

> 6.4 <u>Number</u>.  There shall initially be two
> Managers, who shall each hold at least one
> Managerial Unit, as set forth on Exhibit A.
> The Managers shall be **Tom's S Corp, a Florida
> corporation,** and **Len's S Corp, a Florida
> corporation**.  To the extent any other
> Manager's may have previously served in this
> capacity, the Members each hereby and approve
> the substitution of the aforesaid Managers
> for any previously designated/identified
> Managers.  Each may further assign their
> management responsibilities to any entities
> of which either holds a controlling interest.
> The number of Managers and outstanding
> Managerial Units may be increased only by the
> affirmative vote of Members holding 70
> percent or more of outstanding Units, and
> then only to the extent at least one
> Investment Unit is exchanged for at least one
> Managerial Unit, such that the total Units
> outstanding from time to time always equals
> 100.  If at any time there is one Manager,
> then any reference in this Agreement to the
> "Managers" shall nevertheless refer to the
> single Manager.  All decisions shall be made
> by a majority of the Managerial Units
> outstanding from time to time, and each
> outstanding Managerial Unit shall have one
> vote as Manager hereunder.  If more than one
> Manager is then serving, any difference
> arising as to any matter within the authority
> of the Managers shall be decided by a
> majority in number of the Managerial Units
> then outstanding.....

15.   Paragraph 2(h) of the First Amendment ratifies and

13

Case No. 8:09-CV-551-T-17EAJ

authorizes the sale of the real property contemplated by the
"Vacant Land Purchase Agreement" between Defendant Bayonne, LLC
and Defendant Thomas LeFevre.  Defendant Bayonne, LLC and each
member consented to the assignment of the Vacant Land Purchase
Agreement to Defendant Bayonne Investments, LLC, and extended the
closing date to 10/12/2005.

16.    The Joint Development Agreement ("JDA") was executed on
10/12/2005, and recorded on 10/17/2005. (Dkt. 148-11, pp. 1-32).
The JDA between Defendant Bayonne, LLC (then known as Bayonne
Development, LLC) and Defendant Bayonne Investments, LLC
specifies that it is a binding agreement and runs with the land.

17.    In Paragraph 2 of the Operative Provisions, the
Memorandum of Joint Development Agreement provides:

> 2.  **Memorandum.**   This Memorandum acknowledges
> and confirms the existence of that certain
> Joint Development Agreement dated October 12,
> 2005 (the "Agreement"), which Agreement,
> among other things (a) apportions
> responsibility and costs associated with the
> development, construction, use, and
> maintenance of certain improvements more
> particularly set forth therein (b) grants to
> Bayonne the right to make certain decisions
> with regard to the planning and development
> of the Total Property.  The Agreement
> provides that the obligations, covenants and
> requirements therein shall run with and be
> binding on the affected parcels and/or their
> respective successors in interest.  The terms
> and provisions of the Agreement are
> incorporated herein by reference.

18.    The stated purpose of the JDA is "to provide for the
development of certain shared infrastructure and the

Case No. 8:09-CV-551-T-17EAJ

apportionment of soft and other costs within and adjacent to the
Total Property."  In Paragraph 3, the JDA identifies the
improvements the JDA is intended to cover: the primary access
road for ingress and egress to the Waterfront Property, the
underground utilities servicing the Commercial Property and the
Waterfront Property, drainage facilities servicing both,
stormwater retention/collection/drainage areas servicing both,
landscaping along the primary access road, decorative features
along the primary access road, fountains along the primary access
road, ornamental lighting along the primary access road,
hardscape detailing along the primary access road, signage along
the primary access road, as well as all other improvements,
access and Shared Utilities servicing both the Waterfront
Property and the Commercial Property.  (Dkt. 148-11, pp. 8-9).

19.   The improvements to which the JDA applies are permanent
improvements which will require ongoing maintenance.  In
Paragraph 11, the JDA provides for turning over the enforcement
of the obligations of the JDA to a master Association to be
created for the benefit of all owners, to which the Improvements,
Access and Shared Utilities will be dedicated/conveyed/assigned.
(Dkt. 148-11, p. 13).

20.   In addition to the development of shared infrastructure
and cost-sharing, the JDA specifies design approval, signage,
marketing, the Guard House and construction timeframes.

21.   In Paragraph 20, the JDA includes various reciprocal
covenants, including the following:

Case No. 8:09-CV-551-T-17EAJ

(b).   The Parties shall work together in good
faith to establish and prepare a
comprehensive and detailed master development
plan and construction schedule for the Total
Property.   The Parties shall work diligently
to implement the master development plan
within the time frames set forth in the
construction schedule.   Notwithstanding the
foregoing, the Parties reserve the right to
create and implement a master plan of
development that will not include the other's
project (other than the Shared Utilities,
Access and Improvements, which are necessary
for the development of both projects), and
may proceed to rezone its property (and cause
its site plan to be approved) independently
of the other's Project, provided however,
given the location of the Commercial Property
in relation to the Waterfront Property, any
plans, applications, requests, permits and
authorizations for the Commercial Property
(a) must be approved by Bayonne, in Bayonne's
sole discretion; (b) can have no adverse
impact whatsoever on the Access, Share
Utilities or Improvements within the Easement
areas, and (c) can otherwise have no adverse
impact whatsoever on the Waterfront Project.
Each Party agrees that it will otherwise
fully cooperate with the other to secure any
and all local, state and federal approvals
necessary to construct, or cause the
construction and location of, the Access,
Shared Utilities, and other Improvements on
the Commercial Property in accordance with
the provisions of this Development Agreement.

(c)   Notwithstanding anything contained
herein, once the Waterfront and Commercial
Properties have been re-zoned by the
municipality and binding, non-alterable site
plans have been approved for each such parcel
(the "Plans"), as long as Bayonne
Investments, its successors and/or assigns do
not attempt to change, modify, alter or
deviate from such Plans, Bayonne shall not

16

Case No. 8:09-CV-551-T-17EAJ

> have any right to modify, amend, alter,
> change, vary, ignore, fail to implement or
> otherwise deviate in any manner from the
> Plans (as they pertain to the portions of the
> Commercial Project unrelated to Access,
> Shared Utilities, or other Improvements)
> without the consent of Bayonne Investments,
> its successors and/or assigns, provided
> however, such consent shall not be required
> with regard to any matter pertaining to
> Access, Shared Utilities, or Improvements, or
> any matter contemplated by, or otherwise
> permitted by the Access, Drainage, Signage
> and Utility Easement Agreement of even date.

22.   Defendant Bayonne Investments, LLC obtained a purchase
money mortgage from Gold Bank to purchase the Commercial Property
in 2005.  Defendant Bayonne, LLC alleges that the mortgage was
recorded after the JDA, and is subordinate to the provisions of
the JDA, and foreclosure of the mortgage could not extinguish the
obligations of the JDA.

23.   Defendant M & I Marshall Bank purchased Gold Bank in
2006, and held the mortgage of Defendant Bayonne Investments, LLC
on the Commercial Property at that time.

24.   On April 3, 2006, Plaintiff BCJJ, LLC entered into a
contract to purchase Unit 241 of Residences of Grande Bay, a
Condominium.  (Dkt. 148-1, pp. 1-29).  William Turkish signed the
contract as Purchaser, and Leonard P. Nadolski signed the
Contract as Seller, in his capacity as President of Len's S Corp,
which was the Manager of Bayonne Development, LLC (now known as
Bayonne, LLC).   William Turkish paid $59,940.00 to Defendant
Bayonne, LLC for an earnest money deposit.

17

Case No. 8:09-CV-551-T-17EAJ

25.   The Purchase Agreement for Unit 241 states that it is
subject to the Joint Development Agreement, and indicates that
the Agreement is recorded.   (Dkt. 148-1, p. 7).

26.   In deposition, William Turkish testified that he was
the first purchaser of a unit in Grande Bay, that the price of
Unit 241 was $699,000, but Defendant LeFevre sold it to him for
$599,000 "as a friend."   (Dkt. 199-1, p. 19).   William Turkish
acknowledged that the contract allowed the developer to either
construct the units or not construct them, in the developer's
sole discretion.   (Dkt. 199-1, p. 38).

27.   In his deposition, William Turkish testified that,
prior to making his investment of $400,000, he did not read the
JDA and did not know that the JDA was a recorded public document
((Dkt. 199-1, p. 129).

28.   The transaction which culminated in the closing which
took place on March 27, 2007 was initiated through a series of
telephone communications between Defendant Thomas LeFevre,
William Turkish, Jason Turkish, and Defendant Evan Berlin.   (Dkt.
199-1, pp. 112-115)

29.   In his deposition, William Turkish testified that
Christopher Sullivan represented Plaintiff BCJJ, LLC as to
"Transaction 1," which involved negotiations between March 15,
2007 and March 23, 2007.   "Transaction 1" was to buy seven units
of Bayonne Investments, LLC, and get an upgrade to purchase Unit
441 rather than Unit 241, without any security.   William Turkish
testified that Christopher Sullivan advised him not to accept the

Case No. 8:09-CV-551-T-17EAJ

offer of "Transaction 1." William Turkish testified that
Christopher Sullivan did not represent Plaintiff BCJJ, LLC as to
the transaction after March 23, 2007.

30. In his deposition, William Turkish testified that
"Transaction 2" was seven units of Bayonne Investments, LLC, best
efforts to upgrade from Unit 241 to Unit 441, and secured by TT,
LLC and GLRS. (Dkt. 199-1, pp. 29-30). William Turkish
testified that Jason Turkish handled the negotiations for
"Transaction 2" from March 24, 2007 through the closing on March
27, 2007, with authorization from William Turkish, and with
continuing reporting to William Turkish. (Dkt. 199-1, p. 34).
William Turkish further testified that, in performing due
diligence prior to making the investment of $400,000, he drove by
the GLRS waterfront home in which Defendant LeFevre had a
proprietary interest, and relied on the opinion of Jason Turkish
as to whether there was sufficient equity in TT or GLRS. (Dkt.
199-1, pp. 36, 40). William Turkish testified that Defendant
Evan Berlin acted as his attorney at the closing of the
transaction on March 276, 2007, although Defendant Berlin was not
present at the closing. (Dkt. 199-1, pp. 24, 26, 150-155).

31. In his deposition, William Turkish testified that the
most important thing to him in making the investment of $400,000
was getting an upgrade to Unit 441, along with security in the
event the condominium was not built or the property was sold.
(Dkt. 199-1, pp 37-38, 55). William Turkish testified that the
"Unit Upgrade Agreement" was the primary incentive to make the
investment, not security for Plaintiff's investment. (Dkt. 199-
1, p. 117).

19